# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-0077-02** |
| | : | |
| v. | : | **(Judge Conner)** |
| | : | |
| **HENRY THOMPSON** | : | |

## MEMORANDUM

Presently before the court are defendant Henry Thompson's ("Mr. Thompson") motions (Docs. 106, 107, 108) to suppress evidence. Mr. Thompson asserts that all physical evidence obtained from a storage unit should be suppressed because the warrant authorizing the search was based on stale and false information. Mr. Thompson also contends that any statements he made following his arrest should be suppressed because he was subjected to unlawful coercion. For the following reasons, the court will deny the motions.

## I. Findings of Fact[1]

Mr. Thompson was one of several suspects identified during a drug trafficking investigation conducted by the Drug Enforcement Administration ("DEA") and local authorities. (Doc. 248, at 5). As a result of surveillance and the use of a narcotics sniffing dog, DEA agents postulated that Mr. Thompson was utilizing Storage Unit 3, at Pinola Storage, Building C, 950 Pinola Road, Shippensburg, PA ("the storage unit"), for drug trafficking activities. (Doc. 253, at

---

[1] The court's findings are based upon the court's assessment of the credibility of the testimony and information provided at the October 10, 2012, hearing on the motion.

2). On October 13, 2010, DEA Special Agent Keith Kierzkowski ("Agent Kierzkowski") applied for and received a search warrant for the storage unit. (Id.) Ultimately, Agent Kierzkowski did not execute the warrant because the storage unit "was temporarily not being utilized." (Govt's Exh. 3, at 8).

On December 21, 2010, DEA agents witnessed Mr. Thompson conducting what they believed to be a narcotics transaction. (Doc. 253, at 2). The agents, along with officers from the Carlisle Police Department, attempted to stop Mr. Thompson's vehicle, however, a high speed car chase ensued, and they were unable to effect a vehicle stop. (Id.)

In early January, 2011, Mr. Thompson revisited the storage unit. (Govt's Exh. 3, at 9). He was in fugitive status after January 11, 2011, when an arrest warrant was issued following a domestic violence incident. (Id.)

The court issued a pen register trap and trace and global positioning order for Mr. Thompson's cell phone on February 15, 2011. (Doc. 253, at 3). As a result of the information gleaned from his cell phone, the agents discovered that Mr. Thompson was residing at Room 336 at the Motel 6 in Carlisle, PA ("the motel room"). (Id.) Law enforcement also observed Mr. Thompson's continued use of the storage unit. (Govt's Exh. 3, at 10; Doc. 248, at 17).

Agent Kierzkowski applied for and received a second search warrant for the storage unit on February 23, 2011. (Doc. 248, at 17). On February 25, 2011, law enforcement officers entered Mr. Thompson's motel room and arrested him pursuant to the January 11, 2011, arrest warrant. (Doc. 253, at 3). Mr. Thompson

provided a detailed post-arrest statement to investigators outlining his involvement in the unlawful distribution of controlled substances. (Doc. 248, at 11). Mr. Thompson also provided law enforcement with a code to open a safe contained within the storage unit. (Doc. 253, at 3-4). Law enforcement officers recovered the following items in the storage unit and safe: 3 bottles of inositol powder, a tin with cocaine residue, approximately 7 grams of crack cocaine, two handguns, approximately $2,600, a box of ammunition, a bag of marijuana seeds, and other sundry items. (Id. at 4).

## II. **Procedural History**

On March 9, 2011, a grand jury indicted Mr. Thompson, along with several co-defendants, for unlawfully distributing and possessing with the intent to distribute at least five kilograms of cocaine hydrochloride and at least 280 grams of cocaine base, or "crack" cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. (Doc. 10). Mr. Thompson was also indicted for criminal conspiracy to engage in this conduct, in violation of 21 U.S.C. § 846. (Id.) Mr. Thompson pleaded not guilty on March 10, 2011, and was detained without bail pending trial. (Doc. 25).

On October 19, 2011, Mr. Thompson filed three motions to suppress: (1) to suppress evidence of Mr. Thompson's post arrest statements (Doc. 106); (2) to suppress evidence recovered as a result of the execution of the storage unit search warrant (Doc. 107); and (3) to suppress evidence recovered during the February 25,

2011, search of the motel room (Doc. 108).[2] The court conducted an evidentiary hearing on the motions on October 10, 2012. (Doc. 248). The following witnesses testified for the government: Agent Kierzkowski, Officer Scott W. Wolfe ("Officer Wolfe") of the Shippensburg Police Department, and Agent Jack Langan ("Agent Langan"), formerly of the DEA. (Doc. 248, at 2). The following witnesses testified for the defense: Mr. Thompson himself, Laquilvia Thomas ("Ms. Thomas"), the mother of one of Mr. Thompson's children, and Susanna Artega ("Ms. Artega"), a woman otherwise unrelated to the case who had a previous encounter with Agent Kierzkowski. (Id.) The motions are fully briefed and ripe for disposition.

### III. Discussion

Mr. Thompson alleges that any evidence obtained from the storage unit must be suppressed because the search was based upon an invalid warrant. Mr. Thompson also asserts that his post-arrest statements should be suppressed because they were made involuntarily as the result of law enforcement's promises and threats.

    A.    <u>Storage Locker Warrant</u>

Under the Fourth Amendment, a search warrant must be issued on the basis of probable cause. U.S. CONST. Amend. IV. To establish probable cause, a warrant

---

[2] Mr. Thompson does not address this last ground in his memorandum of law supporting the motions to suppress. (See Doc. 253). Thus, the court shall consider it withdrawn. See L.R. 7.5 ("If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn."). To the extent that it is not abandoned, it is meritless.

application must show that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 218 (1983). In reviewing a magistrate judge's decision to authorize a warrant, the court must decide whether the magistrate judge had a "substantial basis" for determining that probable cause existed. United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010). Probable cause does not exist if the information used as the basis for the warrant is "stale." United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997). The court may also find a warrant invalid if the warrant application "contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006) (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)).

Mr. Thompson contends that the search of the storage unit was unlawful because the warrant authorizing the search was based upon stale and false information.[3] Namely, Mr. Thompson asserts that Agent Kierzkowski submitted

---

[3] This section of defendant's supplemental brief appears to correspond to the motion to suppress docketed as Document 107. That motion also includes allegations that law enforcement officers exceeded the scope of their authority to search the contents of a safe found inside the storage unit because Mr. Thompson only provided the officers with the combination to the safe on the condition that it be examined in the presence of Mr. Thompson or his attorney. (Doc. 107, at 2). Mr. Thompson did not include this argument in his supplemental brief, and the court deems it abandoned. See L.R. 7.5 ("If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn."). It is also meritless: both Agent Kierzkowski and Officer Wolfe testified credibly that Mr. Thompson never imposed such conditions on the officers (see Doc. 248, at 34, 51-52, 114) and the warrant, if valid, authorized law enforcement's entry into the safe regardless of Mr. Thompson's consent.

5

information in his February 23, 2011, warrant application with a reckless disregard for the truth.  Specifically, Mr. Thompson contends that Agent Kierzkowski provided the wrong date for when he obtained the first warrant and that he falsely claimed that law enforcement officers conducted further surveillance of the storage unit in January and February, 2011.  The determination of whether Agent Kierzkowski provided false information regarding storage unit surveillance in January and February, 2011, squarely affects the court's determination of the staleness of the warrant.  Thus, the court shall address this allegation first.

      1.    *False Information*

In Franks v. Delaware, the Supreme Court determined that a defendant may challenge the veracity of factual statements made in an affidavit of probable cause for a warrant application.  438 U.S. 154, 155-56 (1978).  First, the defendant must make a "substantial preliminary showing" that the affiant, knowingly and intentionally or with reckless disregard for the truth, made a false statement that is material to a finding of probable cause.  Id.  If the defendant makes such a showing, the court must order an evidentiary hearing on the matter.  Id. at 156.  At the hearing, the defendant must prove his allegations by a preponderance of the evidence.  Id.  If the defendant meets this burden, the court must examine the warrant application with the false material omitted and determine if the affidavit's remaining content is sufficient to establish probable cause.  Id.  If it is not, the warrant must be voided and the fruits of the search suppressed.  Id.

As the government points out, Mr. Thompson first presented the court with a

potential Franks issue in his supplemental brief in support of the suppression motions. (See Doc. 253). This issue was not addressed in Mr. Thompson's initial motions or at the October, 2012, evidentiary hearing. Additionally, Mr. Thompson did not request a Franks hearing. Thus, the court finds that Mr. Thompson waived the issue. See FED. R. CRIM. P. 47(b) ("A motion - except when made during a trial or hearing - must be in writing, unless the court permits the party to make the motion by other means. A motion must state the grounds on which it is based and the relief or order sought."). Indeed, Mr. Thompson failed to crystallize the issue, and it has evolved *after* the development of the factual record. Importantly, it is based on alleged inconsistencies which could have been easily clarified during the course of the evidentiary hearing. Hence, this is a classic example of prejudice to the non-moving party, to wit: deprivation of the opportunity to explain that which was not at issue during the evidentiary hearing. Moreover, even if Mr. Thompson did not waive the Franks issue, there are plausible explanations for any alleged discrepancies between Agent Kierzkowski's testimony and the February 23rd warrant application. Consequently, assuming *arguendo* non-waiver, the court finds that Mr. Thompson is unable to establish a "substantial preliminary showing" to warrant an additional hearing.

Mr. Thompson alleges that Agent Kierzkowski erroneously states in the February 23rd warrant application that he obtained the first storage unit warrant on December 15, 2010 when he actually obtained it on October 13, 2010. (Doc. 253, at 7; see also Govt's Exh. 3, at 8). Mr. Thompson argues that this error "made the

affidavit information appear to be more recent and less stale." (Id.) However, there is no evidence that Agent Kierzkowski made this statement with any intent to mislead: he was applying for a warrant from the same magistrate judge who had issued the first warrant and was familiar with the facts of the investigation. False statements based upon "negligence" or "innocent mistake," such as this one, are not sufficient to make a substantial preliminary showing of a false statement. Franks, 438 U.S. at 171.

Mr. Thompson also challenges Agent Kierzkowski's claim that law enforcement officers conducted further surveillance of the storage unit in January and February, 2011. According to the February 23rd warrant application, Agent Kierzkowski did not execute a prior warrant for the storage unit because "continued observation of the storage facility and information gathered during the ongoing investigation, led your affiant to believe that the facility was temporarily not being utilized." (Govt's Exh. 3, at 8). Agent Kierzkowski then details an altercation between Mr. Thompson and law enforcement on December 21, 2010, when Mr. Thompson led the officers on a high-speed pursuit after conducting what appeared to be a narcotics transaction. (Id. at 8-9). The next paragraph reads:

> In January 2011, while conducting surveillance operations of Thompson, it was noted that Thompson begin [sic] to frequent the storage facility . . . . Thompson, however, became a fugitive from the Shippensburg Police Department after brutally beating his girlfriend. An active arrest warrant has been issued for Thompson.

(Id. at 9). The active arrest warrant, included as Government's Exhibit 4, was dated

8

January 11, 2011. Agent Kierzkowski explains that he subsequently obtained a pen register (trap and trace and global positioning) order for Mr. Thompson's cell phone on February 15, 2011, because his whereabouts were unknown since the issuance of the arrest warrant on January 11, 2011. (Govt's Exh. 3, at 8; Doc. 248 at 23). After the trap and trace order, Agent Kierzkowski discovered that Mr. Thompson was staying at a motel and was continuing to use the storage unit. (Govt's Exh. 3, at 10). The second storage unit warrant was issued on February 23, 2011, 8 days after the issuance of the trap and trace order. (Govt's Exh. 3). Law enforcement officers arrested Mr. Thompson on February 25, 2011, 10 days after the issuance of the trap and trace order. (Doc. 248, at 5).

Mr. Thompson argues that "[t]here would have been no need for the government to apply for a trap and trace warrant on February 15, 2011, to locate Mr. Thompson if agents were already surveilling Mr. Thompson." (Doc. 253, at 11). Mr. Thompson supports this conclusion by citing to Agent Kierzkowski's testimony at the evidentiary hearing that law enforcement were only able to locate Mr. Thompson after the trap and trace order was obtained. (Doc. 248, at 23-25). Mr. Thompson also cites the testimony of Agent Kierzkowski, Officer Wolfe, and Agent Langan that surveillance of Mr. Thompson did not begin until February 24, 2011, the day prior to his arrest. (Doc. 248, at 25, 52-53, 59-60).

None of this testimony is inconsistent with the facts as set forth in the February 23rd warrant application: law enforcement obviously conducted surveillance of the storage unit some time in early January *before* the arrest warrant

9

was issued on January 11th. Mr. Thompson then became a fugitive. After that date, law enforcement officers were unable to locate Mr. Thompson until after February 15, 2011, when they obtained the trap and trace order.

Mr. Thompson contends that Agent Kierzkowski's testimony demonstrates that law enforcement officers were not conducting surveillance of the storage unit in early January, 2011. On cross-examination, Agent Kierzkowski testified as follows:

> Q: Prior to the 24th when was the last time that you had had eyes on Mr. Thompson before getting the GPS order to figure out his location?
>
> A: I can't recall. It would – I can't recall. Maybe a month? I don't remember, but it was long enough that it made me go to the judge and say I need to find this guy and I need a GPS warrant and here's his new telephone number, so –
>
> Q: Okay. If you had to estimate, do you think it was a couple of weeks? A month?
>
> A: I can't testify to an estimation, I don't know. I don't – I don't recall.
>
> Q: Okay. Do you know or were you informed by the local authorities when the arrest warrant was issued for Mr. Thompson?
>
> A: I don't know the – I don't know the time frame. I just remember, and I just read part of the Detective Wolfe saying, I can remember the conversation he said, "[Mr. Thompson] beat up his wife last night. There's a warrant for him."
>
> [. . .]
>
> Q: Do you recall finding out about it, was it during the time period that when you didn't have surveillance on

> him, or was this prior to that?
>
> A: No, I don't remember. He ran from the police after a drug transaction in Carlisle, and that was probably in December, and he find [sic] of fell off the radar for a while.

(Doc. 248, at 30-31). This testimony demonstrates only that Agent Kierzkowski could not recall, in October 2012, precisely when he was conducting surveillance of Mr. Thompson in January 2011. To be clear, Agent Kierzkowski testified that he could not specifically remember when he had last conducted surveillance prior to obtaining the trap and trace order on February 15, 2011, but he believed that it was approximately one month prior. In other words, Agent Kierzkowski estimated that he had last conducted surveillance in early to mid-January. This testimony is entirely consistent with the warrant application. Accordingly, Mr. Thompson is unable to establish a substantial preliminary showing that Agent Kierzkowski intentionally or recklessly made a false statement in his warrant application based upon the testimony of record.

Mr. Thompson attempts to prove an inconsistency by citing to the agents' testimony that surveillance of Mr. Thompson did not begin until the day prior to his arrest. This testimony, however, must be read in context. Each agent stated that surveillance began the day prior to Mr. Thompson's arrest *when asked specifically about surveillance of the motel room*. (See Doc. 248, at 25 (Q: "[d]id you at some point start to surveil him while he was at that hotel room?"), 52-53 (Q: "Were you part of the surveillance on Mr. Thompson that was conducted while he was at the

11

Motel 6?"), 59-60 (Q: "Before you went to that facility did you participate at all in the arrest of Mr. Thompson at the Motel 6?")). None of the officers testified that these observations constituted the very first surveillance of Mr. Thompson, at the storage unit or elsewhere.

Relatedly, Mr. Thompson also argues that it would be unreasonable for law enforcement officers to conduct surveillance of Mr. Thompson at the storage unit but not arrest him under a viable arrest warrant. (Doc. 253, at 12). However, the February 23rd warrant application indicates that law enforcement officers surveilled the storage unit in January 2011 prior to the issuance of the arrest warrant for domestic violence. (Govt's Exh. 3, at 9). As for any surveillance of the storage unit that may have occurred after February 15th but prior to Mr. Thompson's arrest, it is plausible that the agents simply wanted to minimize the risk of making an arrest of Mr. Thompson, who was known to resist a traffic stop in a dangerous manner. (See Doc. 248, at 36-37 ("I don't want to arrest somebody behind the wheel of a car with his demonstration of not to comply with the police when they go to pull him over. . . .")). This conclusion is supported by the agent's efforts to effect a drug transaction with Mr. Thompson the night before his arrest, (Govt's Exh. 3, at 10; Doc. 248, at 6, 36 ("Well, I think the initial part was the catch him with drugs, to get him out of the room so we didn't have to make entry into the room.")).

Finally, Mr. Thompson argues that the agents could not have observed him using the storage unit after February 15, 2011 because Officer Wolfe testified that

12

Mr. Thompson did not leave the motel from the time he began surveillance until the time of Mr. Thompson's arrest. (Doc. 248, at 53). However, Officer Wolfe only began surveillance of Mr. Thompson on February 24, 2011. (Doc. 248, at 52). There are eight additional days for surveillance of Mr. Thompson at the storage unit – after Agent Kierzkowski had obtained the trap and trace order on February 15, 2011, but before he applied for the second search warrant for the storage unit on February 23, 2011. In conclusion, even if the issue was not waived, Mr. Thompson's convoluted and strained interpretation of the February 23rd warrant application and the evidentiary hearing testimony is not sufficient to set forth a "substantial preliminary showing" that Agent Kierzkowski made a false statement in his warrant application.

    2. *Staleness*

Mr. Thompson also asserts that the February 23rd warrant application relies primarily upon stale information used in the October 13th warrant application. Old information provides less value in the assessment of probable cause. United States v. Williams, 124 F.3d 411, 420 (3d Cir. 1997). However, stale information is less of a concern when the criminal activity is protracted and continuous, such as in a drug trafficking conspiracy. Id. The February 23rd warrant application does rely on the same information that supported the issuance of the October 13th search warrant. Namely, it addresses evidence of Mr. Thompson's involvement in drug trafficking starting in December 2009, including information derived from anonymous tips and confidential sources. (Govt's Exh. 3, at 3-5). The warrant application delineates Mr.

13

Thompson's use of the storage unit in October, 2010, and notes that Mr. Thompson would frequent the location several times a week and stay for approximately one hour. (Id. at 6). On October 12, 2010, a narcotics trained dog alerted to the odor of controlled substances emanating from Mr. Thompson's storage unit. (Id. at 7-8).

The warrant application also includes more recent information. Agent Kierzkowski explains that he witnessed Mr. Thompson engage in a drug transaction on December 21, 2010, and that Mr. Thompson subsequently led officers on a high-speed pursuit. (Id. at 8-9). Mr. Thompson also visited his storage unit in early January and again in late February, 2011. (Id. at 9-10). On February 22, 2011, a confidential source arranged for the purchase of cocaine from Mr. Thompson. (Id. at 10). Based on this considerable amount of evidence, the magistrate judge had a "substantial basis" for determining that probable cause existed to search the storage unit. The warrant was not based upon stale or false information. The court will deny Mr. Thompson's motion to suppress the fruits of that search.

B. <u>Post-Arrest Statements</u>

Mr. Thompson also seeks to suppress his post-arrest statements because he claims the statements were taken in violation of his Fifth Amendment right against compelled self-incrimination.[4] Prior to any custodial interrogation, a suspect must

---

[4] This section of defendant's supplemental brief appears to correspond to the motion to suppress docketed as Document 106. In that motion, Mr. Thompson denies making post-arrest statements to agents on February 25, 2011 and alleges in the alternative that agents obtained his statements in violation of his constitutional

14

be provided with Miranda warnings, which advise him of his right to remain silent, that his statements may be used against him, and his right to an attorney. See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). Before proceeding with any questioning, the suspect must provide a voluntary, knowing, and intelligent waiver of these rights. Id. at 444.

Mr. Thompson asserts that his waiver of Miranda rights was involuntary and the result of coercion and false promises by law enforcement officials. The court determines the voluntariness of a waiver by examining the totality of the circumstances. United States v. Walton, 10 F.3d 1024, 1028 (3d Cir. 1993). A suspect's waiver is not voluntary if his will was overborne by government intimidation, coercion, or deception. Id. Mr. Thompson alleges that Agent Kierzkowski threatened to contact children's services and take Mr. Thompson's son away. (Doc. 253, at 14; Doc. 248, at 96-97, 99). He also claims that Agent Kierzkowski threatened to charge Mr. Thompson with possession of 50 grams of "crack" cocaine if he did not cooperate. (Id.) Mr. Thompson further contends that Agent Kierzkowski promised Mr. Thompson that if he cooperated he would be released in a few days. (Doc. 248, at 97). Ms. Thomas and Ms. Artega corroborated Mr. Thompson's testimony at the evidentiary hearing. (See Doc. 248, at 67, 82).

---

rights. (Doc. 106, at 3). At the evidentiary hearing, Mr. Thompson admitted that he made post-arrest statements to agents but contests the content of some of those statements. (Doc. 248, at 100-101). The court finds that Mr. Thompson did make incriminating post-arrest statements to agents on February 25, 2011, and will thus address only the statements' constitutional implications.

In deciding whether Mr. Thompson's post-arrest statements were voluntary, the court must make a credibility determination. Agent Kierzkowski testified that Mr. Thompson began to cooperate with law enforcement immediately after being advised of his <u>Miranda</u> rights. (Doc. 248, at 11). After law enforcement transported Mr. Thompson to the police department, Agent Kierzkowski testified that he told Mr. Thompson that his <u>Miranda</u> rights still apply, and that Mr. Thompson continued to be cooperative. (Id. at 16). Agent Kierzkowski staunchly denied that he or any other law enforcement agent made any threats or promises to Mr. Thompson or Ms. Thomas that day. (Id. at 22, 29, 32). Agent Kierzkowski explicitly denied making a promise to Mr. Thompson that he would be released in a few days, threatening to take his son away, or threatening to charge him with possession of 50 grams of "crack" cocaine. (Id. at 112-113). Officer Wolfe and Agent Langan corroborated Agent Kierzkowski's testimony by stating that Mr. Thompson was cooperative and that neither they nor any other law enforcement officer made any threats or promises to Mr. Thompson or Ms. Thomas that day. (Id. at 50, 55, 57, 62).

After observing all of the testimony at the evidentiary hearing, the court finds the testimony of the three agents more credible than the testimony of Mr. Thompson, Ms. Thomas, or Ms. Artega. Ms. Thomas admitted to smoking marijuana and assisting Mr. Thompson in hiding from the police. (Id. at 87, 89, 90). Furthermore, Ms. Artega's testimony was inconsistent: she initially stated that, in an unrelated case, Agent Kierzkowski threatened to take her child away if she did not cooperate. (Doc. 248, at 69). Later, she recanted her testimony, explaining that

16

Agent Kierzkowski "didn't say those exact words" but merely instructed another agent to call child services. (Id. at 73). Additionally, Ms. Artega acknowledged lying to the officers about her husband's whereabouts and whether there were weapons in the home. (Id. at 68, 69, 73).

Moreover, Mr. Thompson's own testimony provides support for the conclusion that his will was not overborne by any alleged threats or promises. Mr. Thompson testified that after being threatened by Agent Kierzkowski, he only provided "minimal" cooperation. (Doc. 248, at 99). Mr. Thompson's ability to control the extent of his cooperation indicates that his statements were voluntary. The court finds that there is no credible evidence that Agent Kierzkowski threatened or coerced Mr. Thompson, and the court finds that Mr. Thompson provided his post-arrest statements voluntarily.

## IV. Conclusion

For the foregoing reasons, the court will deny Mr. Thompson's motions (Doc. 106, 107, 108) to suppress. An appropriate order follows.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated: February 15, 2013

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:11-CR-0077-02** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **HENRY THOMPSON** | : | |

## **ORDER**

AND NOW, this 15th day of February, 2013, upon consideration of defendant Henry Thompson's motions (Doc. 106, 107, 108) to suppress, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motions (Doc. 106, 107, 108) to suppress are DENIED.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge